OPINION
{¶ 1} This is a timely appeal from an order of the Columbiana County Court of Common Pleas granting summary judgment against Traci M. Gerace-Flick and her father, Greg Gerace ("Appellants"), and dismissing their complaint against Westfield National Insurance Company and Miller-Thomas Montgomery Agency, Inc. ("Appellees"). Appellants raise four assignments of error involving the trial court's decision to grant summary judgment. Because we conclude that genuine issues of material fact partially preclude resolution of this matter by summary judgment, this Court affirms in part, reverses in part, and remands this matter for further proceedings.
 {¶ 2} In September of 1997, Greg purchased a house in East Liverpool and deeded the property to his daughter, Traci. The real estate agent who assisted in that purchase was Bill Montgomery. (Greg Gerace Depo. Jan. 17, 2001, p. 12). Mr. Montgomery is part owner of an insurance agency known as Miller-Thomas-Montgomery, Inc. ("Appellee MTM"). Montgomery's real estate business and the insurance agency share the same office location. Appellee MTM sells insurance for Westfield National Insurance Company ("Appellee Westfield"). Before Greg closed on the East Liverpool house, he purchased a Westfield homeowner's insurance policy from Appellee MTM. (Greg Gerace Depo. Jan. 17, pp. 59-61). When he did so, however, Greg did not know that Appellee MTM named only Traci as the insured. (Greg Gerace Depo. Jan. 17, pp. 20-22).
 {¶ 3} At his deposition, Greg recounted that although he owned and resided in the house, he deeded the property in Traci's name. This was apparently part of a progressive effort to reduce the value of his personal assets. (Greg Gerace Depo. Jan. 17, 2001, p. 22). Greg's wife at the time suffered from multiple sclerosis. The couple has since divorced. Mrs. Gerace's condition was deteriorating and, anticipating that she would soon move into a residential care facility, Greg had begun to divest himself of assets in an effort to minimize the amount the family would have to pay out-of-pocket for his wife's chronic care. (Traci Gerace-Flick Depo. Jan. 17, 2001, pp. 7-8). According to Greg, he explained all of this to Bill Montgomery when he closed on the house.
 {¶ 4} At the time of the closing, Traci was a 21-year-old student at Kent State University. Traci did not participate in the purchase of the East Liverpool house, nor did she have anything to do with acquiring the insurance policy. (Traci Gerace-Flick Depo. Jan. 17, 2001, pp. 7, 19, 23-24). The policy was subsequently prepared and mailed to Traci at the East Liverpool house. Traci was not aware that the policy explicitly designated her as the property's sole insured. It never occurred to either Traci or her father that they ought to review the policy, and neither was aware of any coverage problems associated with omitting Greg as a named insured.
 {¶ 5} Traci moved out of the East Liverpool house permanently in January of 1999, and married in August of 1999. (Traci Gerace-Flick Depo. Jan. 17, 2001, p. 42). Her name, however, remained on the house's deed, and no changes were made to the homeowner's insurance policy to reflect the fact that she no longer lived there. In September of 1999, when Appellee Westfield renewed the insurance on the house, its terms remained exactly the same. (Affidavit of Douglas C. Hall, July 16, 2001, ¶ 2).
 {¶ 6} On December 26, 1999, the house and its contents were badly damaged in an accidental fire. Appellants submitted a claim to Appellee Westfield seeking to recover for the loss of the house and its contents. Although Westfield eventually paid the limits of its policy for the loss of the house, it refused to pay for damage to personal property unless it belonged to Traci.
 {¶ 7} In a letter to Traci, Appellee Westfield denied Greg's personal property claim because Greg was not insured under the policy. Appellee Westfield noted that the policy defined "insured" as "you (the named insured) and residents of your household who are your relatives or other persons under the age of 21 and in the care of any person named above." (Westfield Homepak Policy, p. 1, First Amended Complaint, Nov. 8, 2000, Exh. A). Appellee Westfield also directed Appellants to the policy's provision entitled Coverage C — Personal Property, wherein Appellee Westfield limited its obligation to "cover personal property owned by * * * [o]thers while the property is on the part of the residence occupied by an insured." (Westfield Homepak Policy, p. 2, First Amended Complaint, Nov. 8, 2000, Exh. A).
 {¶ 8} Appellee Westfield maintained that when it issued the policy naming Traci as the insured, it had no intention of including Greg, or anyone else living in the house, as a named insured. (First Amended Complaint, Nov. 8, 2000, Exh. B; and Affidavit of Douglas Hall, July 16, 2001, ¶ 10). Therefore, Westfield reasoned, once Traci, the named insured, left home, Greg was no longer a member of her household and his personal property was no longer insured under Traci's policy.
 {¶ 9} Appellants filed suit in the Columbiana County Court of Common Pleas alleging breach of contract against Appellee Westfield and seeking declaratory relief and equitable reformation of the insurance policy to include coverage for Greg's personal property. The complaint further alleged that Appellee MTM negligently failed to secure the necessary coverage and that Appellee Westfield, as Appellee MTM's principal, was vicariously liable for the insurance agency's negligence.
 {¶ 10} MTM and Westfield filed motions for summary judgment. Westfield maintained that under the terms of the policy once Traci, the named insured, moved out of the East Liverpool house, Greg was no longer a member of her household and therefore was not an insured. MTM maintained that it breached no cognizable duty to Appellants when it issued the policy, nor was any duty breached in failing to advise Appellants of the consequences attending Traci's decision to leave home.
 {¶ 11} Appellants responded by claiming that Traci and Greg remained a part of the same household even after Traci moved out. In support, Appellants relied on two cases from outside this jurisdiction recognizing that family members could remain part of the named insured's household for coverage purposes even when the insured lived elsewhere.
 {¶ 12} Appellants grounded their negligence claim against Appellee MTM on an affidavit by Steve Adkins, an active insurance agent in Ohio and an expert on insurance underwriting and coverage issues. Adkins detailed several areas where Appellee MTM (and vicariously its principal Westfield) failed to meet accepted industry standards and that such a failure proximately resulted in Greg's inability to collect on his fire loss. (Plaintiff's Brief Opposing MTM's Motion for Summary Judgment, July 31, 2001, Exh. 1, ¶ 4-5).
 {¶ 13} In an order issued on Aug. 9, 2001, the trial court granted Appellees' motion for summary judgment dismissing Appellants' complaint with prejudice. Echoing Westfield's position, the trial court resolved that under the terms of the insurance policy, Greg was not covered for loss of personal property once Traci moved out of the house. (Judgment Entry, Aug. 9, 2001, p. 4). The court also noted that reformation of the Westfield policy to include Greg's coverage was not warranted in this case. According to the court, "reformation of a contract is appropriate only if a contract fails to reflect the parties (sic) true intentions due to fraud or mutual mistake of fact." (Judgment Entry, Aug. 9, 2001, p. 5).
 {¶ 14} In disposing of Appellants' negligence claim, the trial court acknowledged that insurance companies and their agents owe a duty of reasonable care and good faith to their insureds. Nevertheless, the court concluded that Appellants' negligence claim against Appellee MTM was legally unsupportable.
 {¶ 15} Discounting Appellants' insurance expert, the court stated that Appellants were making improper use of an expert by seeking, "to have Mr. Adkins' opinion create the duties against which the performance of MTM and Westfield should be measured." The court held that, "[w]hile the expert of a party serves to explain breaches of legal duty, an expert cannot create a legal duty that did not heretofore exist." (Judgment Entry, Aug. 9, 2001, p. 5).
 {¶ 16} The trial court then dismissed Appellants' breach of contract claim with the following:
 {¶ 17} "Courts should not sanction the continuation of lawsuits for the benefit of individuals who have failed to live up to their own contractual responsibilities. Here, it is evident that plaintiff, Greg Gerace, never requested to be an insured under this policy and that he, in fact, never even read the policy on its issuance." (Judgment Entry, Aug. 9, 2001, p. 6).
 {¶ 18} Ultimately, the trial court summarized its findings as follows:
 {¶ 19} "* * * Greg Gerace is not an insured under the policy entitled to any overage (sic) whatsoever; that MTM was not negligent in the issuance of the policy with regard to him; that the policy has not been breached by either defendant with regard to him; and that neither plaintiff is entitled to reformation of the contract. Thus, the Court finds with respect to all counts of the complaint that there exist no genuine issues of material fact; that reasonable minds can come to but one conclusion; that conclusion is adverse to the plaintiffs; and that the moving parties, both defendants, are entitled to judgment, was (sic) a matter of law." (Judgment Entry, Aug. 9, 2001, p. 6).
 {¶ 20} On August 24, 2001, Appellants filed their notice of appeal from that decision and now raise four assignments of error. Because Appellants' third assignment of error is unrelated to the other three, it will be addressed last. In their first assignment, Appellants claim the following:
 {¶ 21} "THE TRIAL COURT ERRED IN FINDING THAT MTM WAS NOT NEGLIGENT AS A MATTER OF LAW."
 {¶ 22} As we explain in the ensuing discussion, this matter was not properly resolved by way of a summary judgment motion. There are genuine disputes regarding material fact which prevents summary judgment as to the negligence claim against Appellee MTM.
 {¶ 23} This Court subjects a trial court decision granting summary judgment to de novo review. Nationwide Mut. Fire Ins. Co. v. Guman Bros.Farm (1995), 73 Ohio St.3d 107, 108, 652 N.E.2d 684. In other words, on appeal, this Court must undertake an independent review of the summary judgment without according deference to the trial court. Bell v. Horton
(1996), 113 Ohio App.3d 363, 365, 680 N.E.2d 1272. In reviewing the merits of a motion for summary judgment, Civ.R. 56 requires both courts to view the evidence presented in a light most favorable to the nonmoving party. Civ.R. 56(C).
 {¶ 24} To prevail on a summary judgment motion, the moving party must demonstrate that: 1) no genuine issue of material fact remains to be litigated; and 2) it appears from the evidence that reasonable minds can only reach one conclusion. State ex Rel. Parsons v. Fleming (1994),68 Ohio St.3d 509, 511, 628 N.E.2d 1377.
 {¶ 25} Appellants have alleged that Appellee MTM was negligent because the agency failed to exercise the requisite level of care in obtaining appropriate insurance coverage and because the agency failed to advise Greg as to which party should be listed as a named insured and/or an additional insured on the policy. (First Amended Complaint, Nov. 8, 2000, ¶ 27).
 {¶ 26} The elements of a negligence claim are: (1) the existence of a duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) harm to the plaintiff caused by the breach; and (4) damages.Anderson v. St. Francis-St. George Hosp., Inc. (1996), 77 Ohio St.3d 82,84, 671 N.E.2d 225. Whether the defendant owes a duty to the plaintiff presents a legal question that depends upon the foreseeability of the plaintiff's injury. Menifee v. Ohio Welding Products (1984),15 Ohio St.3d 75, 77, 472 N.E.2d 707. An injury is foreseeable if a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act. Id.
 {¶ 27} In the insurance context, an action for negligence may be based upon an insurance agent's failure to procure insurance. Minor v.Allstate Ins. Co. (1996), 111 Ohio App.3d 16, 21, 675 N.E.2d 550. Whether an agent has negligently failed to procure insurance is ordinarily a question of fact. Id. at 22. In Minor, the reviewing court reversed a trial court's decision to grant summary judgment against a claimant alleging breach of contract and negligence against an agent. The claim was based on the agent's failure to obtain the insurance coverage sought by claimaint, concluding that, "an insurance agent who, with a view to compensation, undertakes to procure insurance for another is obligated to do so." Id.
 {¶ 28} It is well settled that an insurance sales agency owes its customers a duty to exercise good faith and reasonable diligence in acquiring its customer's insurance coverage. Slovak v. Adams (2001),141 Ohio App.3d 838, 845, 753 N.E.2d 910; citing Damon's Missouri, Inc.v. Davis (1992), 63 Ohio St.3d 605, 609, fn. 2, 590 N.E.2d 254; and FirstCatholic Slovak v. Buckeye Union Ins. Co. (1986), 27 Ohio App.3d 169,170, 499 N.E.2d 1303. This Court's review of this assignment of error turns on the scope of such a duty.
 {¶ 29} An agent is liable if, "as a result of his or her negligent failure to perform that obligation [to procure insurance], the other party to the [insurance] contract suffers a loss because of a want of insurance coverage contemplated by the agent's undertaking." Clementsv. Ohio State Life Ins. Co. (1986), 33 Ohio App.3d 80, 83, 514 N.E.2d 876. If an insurance agent's negligence results in coverage less than that desired by an insured, the agent will be liable for the amount the insured would have received had the correct coverage been in place.Carpenter v. Scherer Mountain Ins. Agency (1999), 135 Ohio App.3d 316,326, 733 N.E.2d 1196; See, also, 3 Russ Segalla, Couch on Insurance 3d (1997), §§ 46:46 46:71.
 {¶ 30} In the instant case, Appellants properly sought to establish Appellee MTM's negligence through the sworn affidavit of an expert witness. See MBE Collection, Inc. v. Westfield Cos., Inc., 8th Dist. No. 79585, 2002-Ohio-1789. In his affidavit the expert listed the following areas where he believed that Appellee MTM had been negligent:
 {¶ 31} "Teri Marshall (an MTM employee) completed the homeowner's application without ever speaking to the named insured, Traci Gerace-Flick.
 {¶ 32} "The agency completely missed Greg Gerace's strong financial/insurable interest in the property.
 {¶ 33} "Greg should have been shown as the named insured and Traci as an additional insured due to Greg's strong financial interest in the property.
 {¶ 34} "The agency failed to make Greg and /or Traci aware of the importance of informing the agency if and when Traci moved out of the household.
 {¶ 35} "The agency failed to anticipate that Traci might move out of the household and the consequences of such a move.
 {¶ 36} "Renewal underwriting was lacking by both the agency and the carrier.
 {¶ 37} "The agency held itself out as a professional agency. In so doing, it had a greater responsibility to conduct itself accordingly (gathering more complete information, identifying all parties with a financial/insurable interest, etc).
 {¶ 38} "The agency failed to have standard operating procedures in place that may have prevented this mishap.
 {¶ 39} "The agency failed to do field underwriting, new or renewal.
 {¶ 40} "The agency, apparently failed to obtain quotes from other insurance carriers. If other quotes had been obtained, this may have helped the agency do a better and more professional job for the policyholder.
 {¶ 41} "The agency failed to review that policy with the named insured, Traci Gerace-Flick to explain relevant limitations, conditions, and exclusions.
 {¶ 42} "During the entire time the policy existed, Teri Marshall never met or talked to Traci, who was shown as the named insured on the policy, but who was unaware that she was the named insured.
 {¶ 43} "Teri Marshall admitted that she knew of no reason why Greg could not have been added as an additional insured. However, Marshall never discussed with Greg the possibility of adding him as an additional insured. * * *
 {¶ 44} "Teri Marshall failed to advise Greg or Traci that Traci was the named insured on the application and policy. * * *
 {¶ 45} "There is no indication that the carrier effectively serviced the renewal business, which was on a direct bill basis. Under these circumstances, the agent had more responsibility to maintain contact with the insured to stay current and make necessary changes to the policy. This was not done." (Affidavit of Steve Adkins, Plaintiff's Brf. Opposing MTM's Motion for Summary Judgment, Exh. 1).
 {¶ 46} In responding to Appellants' claim, Appellee MTM does not dispute that it failed in any of the allegations listed in the affidavit. Appellee MTM maintains that it had no duty to perform any of the functions listed. Appellee MTM summarily contends that it fulfilled its duty to exercise good faith and due diligence in securing the insurance on the East Liverpool house and its contents. Appellee MTM also maintains that the duties that Appellants' expert attributes to it are too broad, unduly burdensome and all but impossible to satisfy.
 {¶ 47} According to Appellee MTM, Appellants are responsible for the ultimate shortcomings of the insurance because Appellants failed to advise the agency about the change in circumstances that prompted the altered and diminished coverage. Specifically, Appellee MTM complains as follows:
 {¶ 48} "In no way can MTM be charged with responsibility for anticipating the divorce of Traci's parents, the moving of Traci's mother to Montana, Traci's marriage, the moving in of Greg Gerace's girlfriend and her two daughters, or the moving out of Traci herself, all of which were material facts never disclosed to MTM or Westfield." (Appellee MTM's Brf. p. 13).
 {¶ 49} The record, however, appears to dispute Appellee MTM's claims. There is evidence in the record that the insurance agent who sold Greg the homeowner policy had at least some of the information that MTM now claims was not disclosed.
 {¶ 50} During her deposition, Appellee MTM employee Teri Marshall admitted that when Greg came to her inquiring about insurance he explained several of the aforementioned circumstances to her, as follows:
 {¶ 51} "Q. So he came up to the counter, he says, I'm buying this house, here's the address, I'd like to get insurance for this; is that about right?
 {¶ 52} "A. Yes.
 {¶ 53} "Q. Was there any other conversation you had with Greg at that time?
 {¶ 54} "A. He told me that its was going to be deeded in Traci's name, and he mentioned about his wife having an illness and that because of the medical bills, that they were going to put everything in her name.
 {¶ 55} "* * *
 {¶ 56} "Q. All right. So after that conversation was over you had some things that you needed to do then. * * * Tell me what you did?
 {¶ 57} "* * *
 {¶ 58} "A. Yes, We got a copy of the appraisal on the house to get the physical characteristics of the house and a photo and worked up a replacement cost from the guide that we're given by the insurance companies, and then we got back to Mr. Gerace with a cost of the insurance, and he came back in and paid the premium for it and we filled out the application then." (Teri Marshall Depo., Jan. 17, 2001, pp. 6-8).
 {¶ 59} Marshall's testimony reflects that all of her dealings regarding the East Liverpool house were with Greg. As far as Teri Marshall knew, Greg had purchased the house, was closing on the house, was paying for the insurance on the property and its contents, and intended to live in the house. In light of Marshall's knowledge that Greg possessed a financial interest in the property and its contents, questions are certainly raised as to how Appellee MTM managed to leave him off the policy.
 {¶ 60} Appellee MTM disagrees, and likens this case to Fry v.Walters Peck Agency, Inc. (2001), 141 Ohio App.3d 303,750 N.E.2d 1194. As in the instant case, the plaintiff in Fry sued both the insurance agency and company alleging that the agency (and vicariously the insurance company) was negligent in failing to obtain the insurance that plaintiff requested. Specifically, plaintiff complained that his insurance agent failed to advise him that his policy contained an 80% coinsurance provision, which substantially reduced the amount he could recover for certain losses. Id. at 307. The court concluded that the agency, and therefore the insurance company, was not negligent because the plaintiff never advised the agent that he was confused by several provisions in the policy. Further, the court discussed the fact that the agent had routinely offered to go over the policy with the plaintiff, but was unable to do so because the plaintiff was always in a hurry. Id. Under the circumstances, the court properly found that the plaintiff was not in any position to challenge the agency's behavior after the loss occurred.
 {¶ 61} In sharp contrast to Fry, in the instant case, neither Teri Marshall, who prepared the policy, nor Bill Montgomery who helped with the purchase of the house, offered to review the policy with Greg. Greg made no secret of his reasons for deeding the house to his 21-year-old daughter. Further, his daughter was away at college. She was not present during the closing and did not participate in any aspect of the home's purchase. Greg paid for the insurance. Under the circumstances, the notion that Traci might leave home permanently in the foreseeable future was hardly unreasonable. Such a change in circumstances had fairly dramatic implications for the coverage that Greg purchased and was obviously trying to secure on the East Liverpool house and its contents.
 {¶ 62} Courts faced with similar scenarios take a case-by-case approach. In Frank W. Schaefer, Inc. v. C. Garfield Mitchell Agency, Inc.
(1992), 82 Ohio App.3d 322, 612 N.E.2d 442, the reviewing court affirmed the jury's determination that an insurance agency's failure to recommend stopgap insurance to his client amounted to a breach of the standard of care in the insurance industry. Id. at 335. The court reached this conclusion notwithstanding evidence to the contrary which tended to show that stopgap insurance was of dubious value and rarely used in the industry. Id.
 {¶ 63} Similarly, in Gallenstein Bros., Inc. v. General AccidentIns. Co. (S.D.Ohio W.D. 2001), 178 F. Supp.2d 907, the court held that summary judgment was improper because genuine issues of fact existed as to whether the insurance agency was negligent in its procurement of plaintiff's blanket insurance policy. Id. at 918.
 {¶ 64} In Gallenstein, plaintiff submitted a claim to its insurance company after a tornado destroyed one of his buildings. The insurance company denied the claim indicating that plaintiff's policy did not cover the particular building which was destroyed. A complicated lawsuit followed, during which plaintiff sought, among other things, to have the agency held liable for failing to secure insurance for all of his buildings under a blanket policy. The district court denied plaintiff's motion for summary judgment, concluding that the case should be decided by a jury where there was evidence that plaintiff never discussed with the agent the extent and nature of the blanket coverage sought. Id. at 918. In Slovak v. Adams, supra, however, the court held that the insurance agency had no independent duty to notify the insured that the company would not be renewing her insurance. The court also held that the agency did not owe a duty to procure substitute coverage for the insured as a result of the non-renewal even though the agency had caused the company's decision not to renew. Id. at 844-845.
 {¶ 65} Given the circumstances presented in the instant case and viewing them in a light most favorable to Appellants, this Court finds that a question of fact exists as to whether Appellee MTM breached any of its duties to Appellants.
 {¶ 66} Appellee MTM also complains that whether or not they owed any duty to Appellants, Appellants failing to read their policy was the cause of Appellants' own damage. Admittedly, Greg's failure to ever read the Westfield Homepak policy, and thus determine on his own that the coverage may be inadequate, is remarkable. It is axiomatic that one receiving a written instrument in a business transaction is presumed to be familiar with its contents. Slovak v. Adams, supra at 845; and AtlasRealty, Inc. v. Ladies Auxiliary to Broth. of R. R. Trainmen (1960),111 Ohio App. 396, 397, 171 N.E.2d 382; citing, 31 Corpus Juris Secundum, page 838, § 150.
 {¶ 67} Nevertheless, Appellants' failure to read the policy is typically the subject of a comparative negligence defense which is generally addressed at trial and not on a motion for summary judgment. See, Texler v. D.O. Summers Cleaners Shirt Laundry Co. (1998),81 Ohio St.3d 677, 681, 693 N.E.2d 271 (the question as to whether plaintiffs' contributory negligence is the proximate cause of his injury is an issue of fact for the jury to decide pursuant to the comparative negligence provisions of R.C. § 2315); and Collier v. Northland SwimClub (1987), 35 Ohio App.3d 35, 39, 518 N.E.2d 1226 (contributory negligence is generally an issue of fact unless the evidence shows that plaintiff's negligence was so extreme as a matter of law that no reasonable person could conclude plaintiff was entitled to recover). Thus, Appellees themselves raise a factual issue that a jury ought to decide.
 {¶ 68} Appellee MTM lastly contends that even if it were negligent for omitting to name Greg as an insured on the policy, Appellants failed to prove that such an omission proximately caused their damages. A Westfield representative provided testimony that the company would not have issued a policy listing Greg as a named insured. For this proposition, Appellee MTM relies on the deposition testimony of Melinda Jordan, a regional manager at Westfield Insurance Company.
 {¶ 69} Ms. Jordan essentially testified that as a matter of company policy, Westfield would never list Greg to the policy as a named insured because Traci was the property's sole owner. (Melinda Jordan Depo., March 2, 2001, pp. 30-32). Ms. Jordan's testimony, however, wholly discounted the fact that Traci was the owner of the property in name only and that it appears the only family member with a bona fide financial interest in the property was Greg.
 {¶ 70} During her deposition, Appellants' counsel questioned Ms. Jordan in detail, revealing Greg's weighty financial interest in the East Liverpool house. In the following colloquy, Ms. Jordan attempts, not in a very satisfying fashion, to form a distinction between a financial interest and one that, in her opinion, Westfield deems to be an insurable interest:
 {¶ 71} "Q. What do you mean by financial interest?
 {¶ 72} "A. Again, I guess the best way that I can explain that to you is a couple of examples. We don't add a lot of people as additional insureds to our policy. An example if you're buying something on land contract, there is a another party that has an interest in the property. If there is a life estate or something set up, there are other parties that have financial interests. That's the best that I can define that.
 {¶ 73} "Q. By financial interest are you talking about the same thing as an insurable interest?
 {¶ 74} "A. Well, they would have to have a financial interest in order to be added as an additional insured and that will give them an insurable interest.
 {¶ 75} "Q. Well, as I understand it insurable interest means someone is either going to profit or lose by the continuing existence of property; does that sound correct to you?
 {¶ 76} "A. Can you restate that?
 {¶ 77} "Q. An insurable interest means someone will either gain or lose something as a result of the continuing existence of property?
 {¶ 78} "A. But not everybody fitting that parameter. We would also agree their definition would be different. What we feel is necessary criteria for us to add them to our policy. So we defend them maybe different then someone having an interest that we don't feel warrants us to add them as an additional insured." (Melinda Jordan Depo., March 2, 2001, pp. 33-35).
 {¶ 79} Ultimately, according to Ms. Jordan, factors such as whether the person claiming the insurable interest was the actual owner of the property, had paid all of the taxes on it, or had any other indications of a real financial interest would be irrelevant to her determination with respect to whether that individual could claim an insurable interest in any given property. (Melinda Jordan Depo., March 2, 2001, p. 42).
 {¶ 80} The Ohio Supreme Court, however, disagrees. According to the Court, a person has an insurable interest in property when, "* * * he would profit by or gain some advantage by its continued existence and suffer some loss or disadvantage by its destruction." Phillips v.Cincinnati Ins. Co. (1979), 60 Ohio St.2d 180, 181, 398 N.E.2d 564; see accord, Wells v. Westfield Ins. Co., 7th Dist. Nos. 99 CO 7, 99 CO 12, 2001-Ohio-3172. Based on the Supreme Court's understanding of what constitutes an insurable interest, the record at this point demonstrates that Greg possessed such an interest in the East Liverpool house and its contents. Further, it is possible to have provided insurance to protect Appellants' interests which may be in addition to, or slightly different from, a traditional homeowner's policy. Consequently, Appellee MTM's claim that any negligence on its part could not under any set of facts have proximately caused Appellants' damages necessarily fails.
 {¶ 81} In light of the foregoing analysis, this Court concludes that Appellants have sufficiently demonstrated that Appellee MTM was negligent in procuring the insurance on the East Liverpool house to overcome a challenge in summary judgment and to submit the case to a jury. Accordingly, the trial court erred when it granted summary judgment in Appellees' favor on Appellants' negligence claim.
 {¶ 82} In their second assignment of error, Appellants contend that,
 {¶ 83} "THE TRIAL COURT ERRED IN GRANTING WESTFIELD'S MOTION FOR SUMMARY JUDGMENT BECAUSE WESTFIELD IS VICARIOUSLY LIABLE FOR THE NEGLIGENCE OF ITS AGENT, MTM."
 {¶ 84} This assignment of error also has merit. Once we have determined that the trial court erred in granting summary judgment against Appellants on their claim alleging Appellee MTM's negligence, it necessarily follows that the trial court erred in granting summary judgment on Appellants' claim alleging that Appellee Westfield was vicariously liable for MTM's negligence.
 {¶ 85} The acts of an insurance company's general or soliciting agents may bind an insurance company. See Clements v. Ohio State LifeIns. Co., supra; R.C. § 3929.27, and Jim's Car Care Center, Inc. v.West Bay Ins. Agency, Inc. (Dec. 14, 1989), 8th Dist. No. 56311. An insurance company can be held vicariously liable for the negligence of agency under the doctrine of respondeat superior. Whitmore v. MonumentalLife Ins. Co. (Dec. 30, 1988), 10th Dist. No. 88AP-733, at *2.
 {¶ 86} Agency relationships may be established under several theories. Actual agency, such as the one at bar, occurs where there is a consensual relationship between the agent and principal. Restatement of the Law 2d, Agency (1984) 7, Section 1; Funk v. Hancock (1985),26 Ohio App.3d 107, 110, 498 N.E.2d 490. Agency relationships are also established through apparent agency or agency by estoppel (Restatement, supra, at 30-42, Section 8 and 8B; Ageist v. Leisure World Travel, Inc.
(1973), 36 Ohio App.2d 213, 216-217, 304 N.E.2d 910), or by the principal's ratification of the unauthorized acts of another. Restatement, supra, at 210, Section 82. See, generally, Texas-TennesseeInternational, Inc. v. Marshall C. Rardin Sons, Inc. (Aug. 20, 1986), 9th Dist. No. 12431.
 {¶ 87} There is no apparent dispute here that Appellee MTM was acting as Appellee Westfield's agent. The Homepak policy's declarations page even names Appellee MTM as Westfield's "Authorized Representative." Under the circumstances, and in light of the discussion addressing Appellants' first assignment of error, this Court must conclude that the trial court erred in granting summary judgment against Appellants on their vicarious liability claim against Appellee Westfield.
 {¶ 88} In their fourth assignment of error, Appellants maintain as follows:
 {¶ 89} "THE TRIAL COURT ERRED IN REFUSING TO GRANT THE PLAINTIFFS' REQUEST FOR EQUITABLE REFORMATION."
 {¶ 90} Appellants contend that the trial court erred in refusing to "reform" the terms of the policy to reflect the true understanding of the parties. Appellants argue that when Greg purchased insurance on the East Liverpool house and its contents it was the understanding of all parties that the property and its contents would be insured in the event of loss. Although equitable reformation is a remedial device reserved for extraordinary circumstances, we cannot say its use is not warranted here, particularly in light of our resolution of Appellant's first and second assignments of error.
 {¶ 91} The doctrine of equitable reformation allows the court to modify a contract or other instrument where, because of fraud or mutual mistake by the original parties, the instrument fails to reflect their intent. Music v. Sash Storm, Inc., 3rd Dist. No. 1-01-142, 2002-Ohio-1403; citing, Greenfield v. Aetna Casualty Surety Co.
(1944), 75 Ohio App. 122, 128, 61 N.E.2d 276. To demonstrate mutual mistake, the party seeking reformation must clearly and convincingly prove that the parties made the same mistake and that both parties understood the contract as the complaint alleges it ought to have been.Shear; supra, and Merrill v. Hamilton (1982), 9 Ohio App.3d 111, 112,458 N.E.2d 860.
 {¶ 92} Notwithstanding the trial court's conclusion to the contrary, an insurance contract also may be reformed when the mistake involved is only a unilateral one, where such a mistake affects the insurance policy to such an extent that the contract is not a correct integration of the parties' agreement. Snedegar v. Midwestern Indem. Co.
(1988), 44 Ohio App.3d 64, 541 N.E.2d 90.
 {¶ 93} In recognizing that a unilateral mistake may occasion the equitable reform of a contract, the court in Snedegar noted, that, "[w]here one party believes the writing correctly integrates the agreement and the other knows it does not, reformation may be a proper remedy, even though the mistake of writing the contract was not a mutual one." Id. at 69, citing, Ohio Farmers Ins. Co. v. Clinton Cty. Natl. Bank Trust Co. (C.P. 1964), 8 Ohio Misc. 226, 220 N.E.2d 381.
 {¶ 94} The court in Snedegar also pointed out that the terms of a deficient insurance policy could be reformed where the evidence demonstrates that the unilateral mistake that caused the deficient coverage was made with the knowledge of, or due to the negligence or inadvertence of, the insurance agent or insurer. Id. at 70; see also,Warner v. Natl. Liberty Ins. Co. (App. 1932), 13 Ohio Law Abs. 235 (reformation of insurance policy warranted when the agent insured a restaurant as a residence even though the agent knew the property was used as a restaurant).
 {¶ 95} As noted in the discussion addressing Appellants' first assignment of error, the record in the instant case establishes a genuine issue of material fact as to whether Appellee MTM was negligent in securing the coverage Greg sought on the East Liverpool house. When Greg purchased the insurance policy on that house, he obviously intended the policy to cover the house and its contents at the time, that is, his personal property.
 {¶ 96} Moreover, despite MTM's and Westfield's vehement denials, there is enough in this record from which a jury may infer that Appellees, MTM and Westfield (vicariously), understood that the insurance was intended for the East Liverpool house and Greg's personal property when the policy was issued. Realistically, Greg was paying insurance premiums. If these were not specifically sent to insure the East Liverpool house, Appellees have yet to explain just what these payments intended to insure. While Westfield asserts it would have paid Traci's damage claim had it been the home she shared with her husband that had burned instead of the East Liverpool house, this assertion is suspect, at best.
 {¶ 97} This Court recognizes that Appellants are not without blame in this dispute. Greg's failure to advise Appellee MTM regarding Traci's change in circumstances is clearly a fact which operates against Appellants. Further, a jury may conclude that Greg and Traci's failure to review the Westfield Homepak policy in the first instance forecloses their ability to recover. Nevertheless, these are factual concerns to be resolved, not by the trial court on summary judgment, but by a jury at trial. Under the circumstances, the trial court erred when it granted summary judgment with respect to Appellants' request for equitable reformation of the Westfield insurance policy.
 {¶ 98} Appellant's third assignment of error states as follows:
 {¶ 99} "THE TRIAL COURT ERRED IN ITS INTERPRETATION OF WESTFIELD'S INSURANCE POLICY. GREG QUALIFIES AS AN INSURED UNDER WESTFIELD'S POLICY BECAUSE `HOUSEHOLD' IS NOT A DEFINED TERM, IS AMBIGUOUS AS APPLIED TO THE FACTS OF THIS CASE, AND AMBIGUITIES MUST BE RESOLVED IN FAVOR OF THE INSURED."
 {¶ 100} Because policy language to which this assignment of error is directed is clear and unambiguous, we conclude that Appellants' third assignment of error lacks merit. While Appellants direct this Court to two cases from other states adopting expansive definitions of what constitutes a "household" for purposes of imposing insurance coverage, those cases do not represent the law of this jurisdiction.
 {¶ 101} As in any contract dispute, this Court examines insurance policies to determine the intent of the parties by interpreting any terms in dispute in a manner calculated to give the agreement its intended effect. Burris v. Grange Mutual Ins. Co. (1989), 46 Ohio St.3d 84, 89,545 N.E.2d 83. Terms under the policy are given their plain and ordinary meaning. Jones v. Cincinnati Ins. Co. (June 21, 1999), 7th Dist. No. 96 CA 43. Where the policy language is clear and unambiguous, this Court has no authority to rewrite or otherwise construe the language the parties have adopted. Gomolka, supra, at 168.
 {¶ 102} The policy provision at issue here is reasonably clear and unambiguously limits coverage under the policy to the named insured and the following additional individuals: "residents of [the insured's] household who are [the insured's] relatives or other persons under the age of 21 and in the care of any person named above." (Westfield Homepak Policy, Definitions, p. 1). As Appellee Westfield accurately observes, our Supreme Court has defined members of a household in the insurance coverage context as, "those who dwell under the same roof and compose a family," or, "a social unit comprised of those living together in the same dwelling place." Shear v. West America Insurance Co. (1984),11 Ohio St.3d 162, 166, 464 N.E.2d 545.
 {¶ 103} More recently, this Court described a household resident as, "one who lives in the home of the named insured for a period of some duration or regularity, although not necessarily there permanently * * *." Vaughan v. Hume (February 26, 1996), 7th Dist. No. 95 C.A. 18; quoting Farmers Ins. Of Columbus, Inc. v. Taylor (1987), 39 Ohio App.3d 68,70, 528 N.E.2d 968. Accordingly, under the definitions adopted in this jurisdiction, Greg must live in Traci's home with some regularity at the time of the fire to be covered under the policy.
 {¶ 104} Under the definition of "household" that Appellants ask us to accept, members of a household would not be limited to those residing under the same roof. Appellants direct this Court to the reasoning applied in Gibson v. Callaghan (1999), 158 N.J. 662, 730 A.2d 1278. As in the case at bar, Gibson involved a situation where the named insured moved away from the dwelling covered by an Allstate homeowner policy to another home. The named insured's grandson then moved into the covered dwelling to prevent it from being vandalized. When the grandson's dog injured a neighbor, he tendered his defense to Allstate. Allstate refused to defend the named insured's grandson claiming that he was not an insured under the policy.
 {¶ 105} The policy at issue in Gibson contained the same language as that at issue here in the Westfield Homepak policy. The New Jersey Supreme Court disagreed with Allstate's approach in Gibson. The court resolved that the term household was susceptible to several interpretations. Given that ambiguity, the court resolved it in favor of the insured. According to the court, had Allstate wanted to limit the definition of "household" to those living under the same roof, it certainly could have done so in the policy. Id. at 667.
 {¶ 106} Appellants also direct this Court to Erie Ins. Exchangev. Stephenson (Indiana App. 1996), 674 N.E.2d 607, where another court, faced with a fact pattern almost identical to that presented in Gibson,
adopted a construction of the term "household" that was similar to the one taken by the New Jersey Supreme Court. Again, refusing to limit members of a household solely to those living under one roof, the court concluded that one could, "maintain two households or to live as a member of one household and still be the `domestic head' of a separate household." Id. at 610.
 {¶ 107} Notwithstanding the competing viewpoints of other jurisdictions, Ohio courts continue to employ a narrow definition of the term "household" as it is used in insurance policies. Moreover, as suggested by the following passage, there appears to be little inclination to expand the definition:
 {¶ 108} "Although some courts have defined the term `household' to include part-time residents, because the insurance policy between appellant's parents and appellee employs the term `primarily,' the policy covers only relatives who reside `primarily' with the insureds. Appellant does not live primarily with his parents in their house; appellant lives primarily in the house trailer." Waugh v. Akers (Jan. 25, 1999), 4th Dist. No. 98 CA 21, at p. 4.
 {¶ 109} Furthermore, even if this Court were to adopt Appellants' interpretation of "household," it is unlikely that Greg would be entitled to the coverage he seeks under Westfield's Homepak policy. The record reflects that, although some of Traci's personal property remained in the East Liverpool house when the fire occurred, she had married and moved out, and her connection to the house was remote. (Traci Gerace-Flick Depo. Jan. 17, 2001, pp. 12, 15, 42-44). In light of her diminished connection to the East Liverpool property, Appellants are hard-pressed to demonstrate the house was part of Traci's "household" at the time of the fire, even under the broadest of definitions. Consequently, Appellants' third assignment of error lacks merit.
 {¶ 110} In light of the discussion set forth above, this Court overrules Appellants' third assignment of error, but we find that Appellants' first, second, and fourth assignments have merit. Consequently, the decision of the Columbiana County Court of Common Pleas is affirmed in part and reversed in part and this matter is remanded to the trial court for further proceedings according to law and consistent with this Court's Opinion.
Donofrio, J., concurs.
DeGenaro, J., dissents.